2005 WY 95

**Keith L. DOBSON and Aspen Construction Company, Inc., Appellants (Defendants/Counterclaimants),**

v.

**PORTRAIT HOMES, INC., Appellee (Plaintiff).**

No. 04–226.

Supreme Court of Wyoming.

Aug. 17, 2005.

Peter K. Michael, Cheyenne, Wyoming, for Appellants.

Brian S. Bailey and Henry F. Bailey, Jr. of Bailey, Stock & Harmon, P.C., Cheyenne, Wyoming, for Appellee.

Before HILL, C.J., and GOLDEN, KITE, and VOIGT, JJ., and BROOKS, D.J.

VOIGT, Justice.

[¶ 1] In a controversy between an owner/contractor and a claimed materialman, the district court granted judgment to the owner/contractor on the ground that the claimed materialman did not have a valid lien, and that the owner/contractor had paid the disputed amount under economic duress. We reverse.

## ISSUES

[¶ 2] The parties have identified numerous issues. We find the dispositive issues to be as follows:

    1. Did the parties reach an enforceable compromise and settlement?

    2. Did the owner/contractor participate in the purported compromise and settlement as the result of economic duress?

## RELEVANT STATUTES

[¶ 3] This case revolves around the statutes creating a materialman's lien. The relevant portions of Wyo. Stat. Ann. §§ 29–1–301, *et seq.*, and 29–2–101, *et seq.* (LexisNexis 2005) provide as follows:

    § 29–1–310. Bond to satisfy lien; terms of bond; filing and effect thereof; action upon bond.

    (a) Any lien created pursuant to Title 29 filed against any property, personalty or realty is satisfied if the owner of the prop-

erty, a contractor or subcontractor has filed a corporate surety bond, letter of credit, cash or cash equivalent of established value approved by the district court in the county where the lien was filed in an amount equal to one and one-half (1½) times the amount of the lien.

. . .

(e) Upon the filing of the bond, the lien against the property shall be forthwith discharged and released in full, and the security described in subsection (a) of this section shall be substituted. The clerk of court shall issue a notice of satisfaction of lien which the owner, contractor or subcontractor may file in the office of the county clerk where the lien was filed which shall show that the lien has been satisfied.

(f) A lien claimant whose lien has been satisfied by the substitution of the security described in subsection (a) of this section may bring an action upon the bond or undertaking. The action shall be commenced within the time allowed for the commencement of an action to foreclose the lien.

### § 29-1-311. False or frivolous liens; damages; penalties.

. . .

(b) Any person whose real or personal property is subject to a recorded claim of lien who believes . . . that the person claiming the lien knew at the time of filing the lien was groundless . . . may petition the district court of the county in which the claim of lien has been recorded for the relief provided in this subsection. . . . Upon the filing of the petition the following shall apply:

(i) The court may enter its order, which may be granted ex parte, directing the person claiming the lien to appear before the court at a time no earlier than six (6) nor later than fifteen (15) days following the date of service of the petition and order on the person claiming the lien, and show cause, if any, why the relief provided in this subsection should not be granted;

. . .

(iv) If, following a hearing on the matter the court determines that . . . the person claiming the lien knew at the time of filing the lien was groundless . . . the court shall issue an order striking and releasing the claim of lien and awarding damages of one thousand dollars ($1,000.00) or actual damages, whichever is greater, costs and reasonable attorney's fees to the petitioner to be paid by the person claiming the lien[.]

### § 29-2-101. Persons entitled to liens; extent of lien on realty; exceptions.

(a) Except as provided in W.S. 29-2-111, every person performing any work on or furnishing any materials or plans for any building or any improvement upon land shall have for his work done or plans or materials furnished a lien upon the building or improvements, and upon the land of the owner on which they are situated to the extent of one (1) acre. If the improvements cover more than one (1) acre the lien shall extend to all the additional land covered thereby.

(b) To have a lien the work or materials shall be furnished under a contract.

### § 29-2-106. When statement lien to be filed; rights of subcontractor not abridged by contract between owner and contractor; agreement to extend filing period.

(a) Every contractor shall file his lien statement within one hundred twenty (120) days and every other person shall file within ninety (90) days:

(i) After the last day when work was performed or materials furnished under contract; or

(ii) From the date the work was substantially completed or substantial completion of the contract to furnish materials, whichever is earlier; or

(iii) With respect to an employee or subcontractor, after the last day he performed work at the direction of his employer or contractor.

### § 29-2-107. Notice of intention to file lien.

Before filing a lien pursuant to this chapter every person shall give ten (10) days notice to the owner or his agent in writing of any claim against a building or

an improvement or for materials furnished stating the amount of any claim and from whom it is due.

### § 29–2–111. Notice of right to claim a lien required; limitations.

(a) Any subcontractor or materialman who may claim a lien under this title shall give notice of his right to claim a lien to the prime contractor. Failure to give notice to a prime contractor who has complied with subsections (f) and (g) of this section waives the subcontractor or materialman's right to a lien.

(b) The notice of the right to claim a lien shall be given no later than sixty (60) days after the date on which services or materials are first furnished.

### FACTS

[¶ 4] Portrait Homes, Inc. (Portrait Homes), as owner and contractor in a residential construction project, contracted with Paul Vinluan (Vinluan) for Vinluan to provide all labor and materials necessary for the drywall portion of the construction. As a result of personal friendships, Vinluan had an arrangement with Aspen Construction Company, Inc. (Aspen Construction), to use Aspen Construction's account at Building Specialties, Inc. (B.S.I.), to order materials for Vinluan's various projects.

[¶ 5] In the fall of 2002, Vinluan purchased materials from B.S.I., using Aspen Construction's account, and installed those materials in Portrait Homes' project. All such materials were either picked up by Vinluan or were delivered to the building site by B.S.I. When the project was completed, Portrait Homes paid Vinluan in full, but Vinluan did not pay Aspen Construction for the materials that had been charged to its account at B.S.I.[1] When Aspen Construction sought payment from Vinluan on the B.S.I. invoices, Vinluan told Aspen Construction, untruthfully, that he had not been paid by Portrait Homes. Consequently, Aspen Construction sent to Portrait Homes, pursuant to Wyo. Stat. Ann. § 29–2–111, a notice of right to file a lien. Upon receipt of that notice, Portrait Homes confirmed with B.S.I. that the materi-

als had been invoiced to Aspen Construction, but, nevertheless, contacted Aspen Construction to inform the latter that a lien filing would result in a lawsuit for damages for any loss of sale caused thereby. Aspen Construction responded by sending to Portrait Homes, pursuant to Wyo. Stat. Ann. § 29–2–107, a notice of intent to file a lien.

[¶ 6] What followed was a stalemate, as the parties and their attorneys exchanged letters contending for their respective positions. In the meantime, three things were happening: (1) Portrait Homes was being advised by its real estate broker not to allow a lien to be filed against the property because even a satisfied lien might raise concerns for potential buyers; (2) Portrait Homes entered into a sale contract that required it to furnish a title commitment showing marketable title; and (3) Aspen Construction's lien filing deadline was approaching. Finally, on the last day that Aspen Construction could file its lien statement, Portrait Homes delivered full payment of the contested amount to Aspen Construction, along with a letter containing the following language:

> Enclosed with this letter is a check from Portrait Homes, Inc. in the amount of $3,645.18 for payment of drywall materials which you maintain were provided for the residence currently being constructed by Portrait Homes.... As you know, we maintain that payment for these materials was made in full to our original drywall contractor, [Vinluan].

> This payment is being made under duress and in no way is an admission by Portrait Homes that your claim is valid. We are making this payment solely to prevent a lien from being filed against the property so as to cloud the title and possibly prevent a sale of the property.

[¶ 7] In return for the payment, Aspen Construction prepared and immediately delivered a lien waiver to Portrait Homes. No lien statement was ever filed, and the home was sold without incident. Several months later, Portrait Homes sued Aspen Construction in the circuit court, alleging in an

---

1. The amount was $3,645.18.

amended complaint causes of action for damage to business reputation, constructive fraud, and unjust enrichment. The case was transferred to the district court because the circuit court's jurisdictional limit was exceeded by Aspen Construction's counterclaims. The case was tried to the court, after which judgment, with detailed findings of fact and conclusions of law, was entered in favor of Portrait Homes. This appeal followed.

## STANDARD OF REVIEW

[¶ 8] We recently reiterated the standard of review of a bench trial in which the court made express findings of fact and reached express conclusions of law, and we see no need to repeat that standard at length. *See Jacoby v. Jacoby,* 2004 WY 140, ¶¶ 6–7, 100 P.3d 852, 854–55 (Wyo.2004).

## DISCUSSION

■■■■ [¶ 9] Aspen Construction contends that its delivery of a lien waiver in exchange for payment, on the last day a lien statement could have been filed, constituted a compromise and settlement of the dispute. This Court has on several occasions addressed the theory of "compromise and settlement." In *Parsley v. Wyoming Automotive Co.,* 395 P.2d 291, 295 (Wyo.1964), we described the general rule of compromise and settlement as being "that the settlement of a bona fide dispute or a doubtful or unliquidated claim, if made fairly and in good faith, is a sufficient consideration for a compromise based thereon." We have defined a compromise as " 'an agreement between two or more persons who, to avoid a lawsuit, amicably settle their differences on such terms as they can agree on.' " *Peters Grazing Ass'n v. Legerski,* 544 P.2d 449, 456 n. 3 (Wyo.1975) (*quoting* 15A C.J.S. *Compromise and Settlement* § 1 at 170). A settlement agreement is a contract and, therefore, subject to the same legal principles that apply to any contract. *In re Estate of Maycock,* 2001 WY 103, ¶ 10, 33 P.3d 1114, 1117 (Wyo.2001); *Matter of Estate of McCormick,* 926 P.2d 360, 362 (Wyo.1996). The elements are the same as the elements of any contract: offer, acceptance, and consideration, and establishment of the existence of these elements leads courts to conclude

that mutual assent has occurred. *Matter of Estate of McCormick,* 926 P.2d at 362. A compromise and settlement agreement is, also like other contracts, subject to construction as a matter of law. *Ludvik v. James S. Jackson Co., Inc.,* 635 P.2d 1135, 1143 (Wyo. 1981).

> A contract made in settlement of claims is valid even if the claims settled are of doubtful worth.... This means that this court will not look behind a settlement agreement to see who would have prevailed in a dispute out of which the settlement agreement arises. If the settlement agreement itself meets contractual requirements, it will be enforced.

*Kinnison v. Kinnison,* 627 P.2d 594, 596 (Wyo.1981).

[¶ 10] In addition to these general principles, we will note certain aspects of the law of compromise and settlement that have particular application to this case.

> In order for a claim to be considered disputed, there must be a genuine controversy or difference in position between the parties[.] ... If, at the time of an agreement, there is no dispute between the parties and neither party believes that there is any uncertainty as to the rights and obligations between them, the agreement is not a compromise.

15A Am.Jur.2d *Compromise and Settlement* § 24 at 743–44 (2000) (footnote omitted). "Since the basic function of a compromise is to resolve doubt or uncertainty through amicable means rather than through litigation, a disputed claim must involve doubt or uncertainty in order to constitute a sufficient foundation for a compromise." *Id.,* § 25 at 744 (footnote omitted).

> The validity of a compromise is not impaired by the fact that the compromise resolved issues differently than a court might have; if the validity of a compromise depended upon which party actually was right, the very object of a compromise which the law favors—avoiding the necessity of having a court resolve uncertainties—would be defeated. Thus, a claim need not be valid or well founded to support a compromise. Accordingly, compro-

mises often are upheld without regard to the validity of the claims or rights which were compromised.

*Id.,* § 27 at 745–46 (footnotes omitted). Where there is a good-faith dispute involving a claim, and the party asserting the claim relinquishes it as part of a compromise and settlement, such a concession is sufficient consideration for the promise or act of the other party. *Id.,* § 30 at 747.

[¶ 11] The judgment entered by the district court noted that Aspen Construction asserted compromise and settlement as a defense, and noted that Aspen Construction had the burden of proving that defense by a preponderance of the evidence. Thereafter, the district court made no specific findings and reached no specific conclusions in regard to compromise and settlement. In addressing economic duress, however, the district court stated that "[d]uress is a legal basis for a party to seek rescission of a contract and restitution of its consideration." That statement makes sense only if the district court had concluded that the exchange of payment for a lien waiver constituted a contract under the theory of compromise and settlement.

[¶ 12] We agree with the district court. The facts clearly show the offer, acceptance, and consideration necessary to create a contract. It is from the confluence of these factors, rather than from the subjective intent of the parties, that courts find mutual assent:

> In Wyoming, we examine the objective manifestations of the parties' contractual intent to determine whether a contract was formed. *McDonald v. Mobil Coal Producing, Inc.,* 820 P.2d 986, 990 (Wyo.1991). "Under the 'objective theory' of contract formation, contractual obligation is imposed not on the basis of the subjective intent of the parties, but rather upon the outward manifestations of a party's assent sufficient to create reasonable reliance by the other party." *Id.* A party's intention will be held to be what a reasonable person in the other party's shoes would conclude his manifestations to mean. *Shrum v. Zeltwanger,* 559 P.2d 1384, 1387 (Wyo. 1977).

*Givens v. Fowler,* 984 P.2d 1092, 1095 (Wyo. 1999). A contract can be formed where one party lacks subjective intent, but nevertheless proceeds as if there were a contract. *McDonald v. Mobil Coal Producing, Inc.,* 820 P.2d 986, 990 (Wyo.1991). " 'The conduct of a party may manifest assent even though he does not in fact assent. In such cases a resulting contract may be voidable because of fraud, duress, mistake, or other invalidating cause.' " *Id.* (*quoting Restatement (Second) of Contracts* § 19 (1979)).

[¶ 13] Portrait Homes contends that no contract was formed in this case because there was no mutual assent, inasmuch as it did not voluntarily pay Aspen Construction and intended to sue to get its money back. That subjective intent does not defeat the objective manifestation of a contract in the form of that payment, reasonably relied upon by Aspen Construction. Furthermore, if Portrait Homes did not intend to reach an enforceable agreement, it should not have accepted in consideration thereof the lien waiver provided in exchange for payment.

[¶ 14] Portrait Homes' second argument that a contract was not formed alleges failure of consideration: because Aspen Construction's lien was invalid, it gave up nothing in exchange for the payment. This argument is defeated by reference to the law cited above, especially *Kinnison,* 627 P.2d at 596. Whether or not the lien was valid as a matter of law, Aspen Construction's waiver of the lien was sufficient as consideration for the compromise and settlement. *Parsley,* 395 P.2d at 295; 15A Am.Jur.2d, *supra,* § 27 at 745–46. The facts are sufficient to establish that Aspen Construction had a colorable claim to a lien, and did not act in bad faith in pursuing it.

[¶ 15] The conclusion that the parties' dispute was resolved by compromise and settlement leads to the next inquiry, that being whether the agreement should be set aside because it resulted from "economic duress". We have described that theory as follows:

> Kendrick bears the burden of proving that she agreed under duress. *Goodson v. Smith,* 69 Wyo. 439, 457–58, 243 P.2d 163, 171 (Wyo.1952). "[D]uress exists whenev-

er a person is induced, by the unlawful act of another, to perform some act under circumstances which deprive him of the exercise of free will." *In re TR,* 777 P.2d 1106, 1111 (Wyo.1989). Kendrick's argument that financial issues constituted duress is a claim of economic duress.

"Whether particular facts are sufficient to constitute economic duress is a question of law. Whether these circumstances exist is a question of fact. The Tenth Circuit Court of Appeals, when applying Wyoming law to a duress defense to avoid the enforcement of an agreement, said

'The Wyoming test for duress is not inconsistent with the test for economic duress developed in those states which have expressly recognized economic duress as grounds for avoiding a settlement agreement.'

[*Applied Genetics International, Inc. v. First Affiliated Securities, Inc.,* 912 F.2d 1238, 1242 (10th Cir.1990)] This Court, however, has not directly had the opportunity to adopt what is commonly known as the 'economic duress' doctrine. We take this opportunity now to do so and embrace the three-prong test employed by many courts to determine whether economic duress exists. Under this test, economic duress occurs when (1) a party involuntarily accepts the terms of another, (2) the circumstances permit no other alternative, and (3) such circumstances are the result of coercive acts of the other party. Economic duress does not exist, however, unless a person has been the victim of a wrongful act and has no reasonable alternative but to agree with the terms of another or be faced with a serious financial hardship. What constitutes a coercive act or reasonable alternative is a question of fact depending upon the circumstances of each case."

*Kendrick v. Barker,* 2001 WY 2, ¶ 24, 15 P.3d 734, 741 (Wyo.2001) (*quoting Blubaugh v. Turner,* 842 P.2d 1072, 1074–75 (Wyo.1992)).

[¶ 16] With this test in mind, the district court threw out the compromise and settlement agreement on the ground that Portrait

Homes was the victim of economic duress. First, the district court found that Portrait Homes had only three options: pay the amount demanded and avoid filing of the lien statement, "bond around" the immediate problem via Wyo. Stat. Ann. § 29–1–310, or place a sufficient amount into escrow and pursue subsequent litigation. The district court then found that all of these alternatives were unreasonable under the circumstances. Finally, the district court clearly placed the "blame" for the economic duress upon Aspen Construction for pursuing a lien when it did not fit the definition of a materialman under the statute.

[¶ 17] We reverse the district court because Portrait Homes has failed to prove any but the first element of the doctrine of economic duress. There is little question that Portrait Homes involuntarily, even begrudgingly, paid Aspen Construction the amount demanded in exchange for the lien waiver. However, given the relatively small amount in controversy, that being $3,645.18, and Portrait Homes' admission both that it knew of the bonding statute and that it had the funds available to pursue that remedy, the facts simply do not support a contention that the circumstances permitted no reasonable alternative. This is especially true because Portrait Homes also could have turned to the alternative expedited judicial process provided in Wyo. Stat. Ann. § 29–1–311.[2] There may be a situation where the ratio of the disputed amount to the expected sale proceeds is such that it would be entirely unreasonable to risk payment under similar circumstances. But here, where $3,645.18 was at issue, and the sale price under the pending sale agreement was $380,000.00, that risk imbalance does not exist. Were we to say that, under the facts of the instant case, the statutory alternatives were unreasonable, that would be tantamount to saying that they can never be reasonable and the statutes are a nullity.

[¶ 18] We are further convinced that Portrait Homes' economic duress theory must fail because it did not prove that Aspen Construction's conduct was wrongful, or un-

---

**2.** It is unclear what escrow procedure is contem- plated in the district court's list of alternatives.

lawful, as contemplated under that doctrine. Compromise and settlement could not exist as a theory if the settlement agreement could always be undone by proving that one party or the other would have lost its factual or legal argument in litigation. Pursuing a statutory lien in good faith is not a wrongful or unlawful act, even if it eventually turns out that the lien is invalid for one reason or another. The evidence does not support a conclusion that Aspen Construction knew its lien was invalid, especially since it has not been conclusively established that it was, indeed, invalid.

## CONCLUSION

[¶ 19] The parties reached a compromise and settlement of their dispute when Portrait Homes paid the full amount demanded in return for Aspen Construction's immediate delivery of a lien waiver. ·Portrait Homes did not participate in that compromise and settlement as a result of economic duress, inasmuch as there were reasonable alternatives available to it, and Aspen Construction's conduct was not wrongful or unlawful.

[¶ 20] We reverse and remand for entry of a judgment consistent herewith.

VOIGT, Justice, delivered the opinion of the Court; HILL, Chief Justice, filed a dissenting opinion, with which BROOKS, District Judge, joined.

HILL, Chief Justice, dissenting, with whom BROOKS, District Judge, joins.

[¶ 21] I respectfully dissent because I do not believe the majority opinion gives adequate credit to the district court's role as the fact finder in this "simple," yet profoundly troubling case, nor does it fully credit the findings of fact and conclusions of law adopted by the district court.

[¶ 22] I think it is important that we set out the applicable standard of review, at least briefly:

> The trial court made express findings of fact and conclusions of law. The factual findings of a judge are not entitled to the limited review afforded a jury verdict. *Hopper v. All Pet Animal Clinic, Inc.*, 861 P.2d 531, 538 (Wyo.

1993). While the findings are presumptively correct, the appellate court may examine all of the properly admissible evidence in the record. *Id.* Due regard is given to the opportunity of the trial judge to assess the credibility of the witnesses, and our review does not entail weighing disputed evidence. *Id.* Findings of fact will not be set aside unless the findings are clearly erroneous. *Id.* A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. *Id.* We review a district court's conclusions of law de novo on appeal. *Id.*

*Springer v. Blue Cross and Blue Shield of Wyoming*, 944 P.2d 1173, 1175–76 (Wyo. 1997).

*Roussalis v. Apollo Electric Company*, 979 P.2d 493, 495 (Wyo.1999); and *see Jacoby v. Jacoby*, 2004 WY 140, ¶¶ 6–7, 100 P.3d 852, ¶¶ 6–7 (Wyo.2004); and *Lebsack v. Town of Torrington*, 698 P.2d 1141, 1146 (Wyo.1985) (Under W.R.C.P. 52(a) findings need only be sufficient to indicate the basis or steps taken for the decision upon the contested matters; they need not be set forth in elaborate detail but need only be clear, specific and complete in concise language informing the appellate court of the underlying basis for the trial court's decision.); 9A Charles Alan Wright and Arthur R. Miller, *Federal Practice and Procedure*, Civil 2d §§ 2579 and 2580, esp. pp. 550–51 (1995 and Supp.2004) (appellate court reads trial court's memorandum/opinion liberally to find within it the required findings).

[¶ 23] It is also important that we set out the pivotal conclusions reached by the district court:

> 12. An action for unjust enrichment (money had and received) is equitable in nature and lies upon proof that the Defendant has received money of the Plaintiff which, in equity and good conscience, it ought not to retain. *Landeis v. Nelson*, 808 P.2d 216 (Wyo.1991). In this case, Plaintiff paid twice for the drywall materi-

als delivered by B.S.I. and installed by Vinluan on its construction project at 5908 Foxhill Road; it paid Paul Vinluan (d.b.a. A.O.I.) upon completion of the drywall portion of the project and then paid Defendant Aspen when Defendant asserted invalid lien rights. Because Defendant Aspen does not fit the statutory definition of a materialman, he received money from Plaintiff to which he was not entitled. *Engle v. First National Bank of Chugwater[,* 590 P.2d 826 (Wyo.1979)], *supra.* Defendant received the money from the Plaintiff and was under notice that if Plaintiff pursued a remedy, Defendant would be required to repay the proceeds. Plaintiff has met its burden of proof regarding unjust enrichment. Defendant Aspen has been unjustly enriched at Plaintiff's expense and should return the proceeds to Plaintiff.

13. Duress is a legal basis for a party to seek rescission of a contract and restitution of its consideration. Restatement of the Law of Restitution § 70 (A.L.I. 1937). In order to prove economic duress by a preponderance of the evidence, Portrait Homes had to prove each of the following essential elements: (1) a party involuntarily accepted the terms of another; (2) circumstances permitted no other alternative; and (3) the circumstances were the result of the coercive acts of the other party. *Kendrick v. Barker,* 15 P.3d 734, 741 (Wyo. 2001). "Economic duress *does not exist,* however, unless a person has been victim of a wrongful act and has no reasonable alternative but to agree with the terms of another or be faced with serious financial hardship." *Id.* In the Court's view, these elements have been established. The evidence was uncontroverted that Plaintiff's payment to Defendant was not voluntary. Defendant's conduct was "coercive," i.e. threatening to file an invalid lien unless money was paid. And finally, Plaintiff had no reasonable alternative but to pay the money demanded. "Bonding around" the lien, as Defendant suggests Plaintiff should have done, while it may have satisfied the lien, would not have prevented the lien from being filed. According to Larry Sutherland, a licensed broker with 27

years of experience in the real estate industry, the lien would have appeared on the title commitment. It was reasonable for Plaintiff to rely on Mr. Sutherland's advice and recommendations concerning the potential adverse impact of the threatened lien, which was the possible loss of the sale of the property, which was a $390,000.00 sale. Defendants introduced no testimony to contradict Mr. Sutherland's opinions. The potential loss of a sale of this magnitude, especially with an outstanding construction loan, posed a risk of serious financial harm that Plaintiff could not reasonably ignore.

14. Defendant has failed to sustain its burden of proof regarding its asserted affirmative defenses.

[¶ 24] It is apparent that the majority opinion chooses to disregard the district court's findings as to unjust enrichment entirely. It is my conviction that they serve as an independent basis upon which to affirm the district court's judgment. See generally, *Boyce v. Freeman,* 2002 WY 20, ¶¶ 12–15, 39 P.3d 1062, ¶ 12–15 (2002); and *Landeis v. Nelson,* 808 P.2d 216, 217–19 (Wyo.1991).

[¶ 25] Beyond that, the district court concluded, as a second independent basis for granting relief to Portrait Homes, that the transaction between the parties could be avoided by application of the theory of "economic duress." By simply turning the numbers at stake here upside down, and by avoiding a comprehensive discussion of the concept of "economic duress," the majority at once dismisses the applicability of "economic duress" and fully credits many of Aspen Construction's affirmative defenses (which the trial court found had not been proved). After a detailed examination of the concept of "economic duress," I am convinced that the district court correctly applied that law to the circumstances of this case. See generally, 28 Williston on Contracts, Chapter 71 (Duress and Undue Influence), §§ 71:1–71:33 at 423–548, §§ 71:40–45 at 566–587, and see especially § 71:28 at 539–40, ("Analogous to cases of the improper detention of goods are cases where the assertion of a lien upon real property has been used as a means of coercion, although no lien existed, or if it existed,

it should have been discharged; in such instances, the improper action generally constitutes duress.") (4th ed.2003). Moreover, as the Williston treatise develops in great detail, the application of the concept of "economic duress" has steadily broadened in its application, particularly to provide equitable relief in cases involving unethical business practices.

[¶ 26] Here, the district court focused on the value of the property that was to be held hostage by the lien ($390,000.00), as opposed to Aspen's small but spurious lien ($3,615.18), whereas the majority simply reverses that equation, i.e., in order to protect the $390,000.00 sale all Portrait Homes had to do was cough up a mere $3,615.18. I think the district court's emphasis is more apt, but certainly it is not clearly erroneous because it accurately reflects the testimony of the owners of Portrait Homes and their real estate advisor, while at the same time giving little credibility to Dobson's self-serving testimony. In addition, the district court did make reference to the protestations of the victims of the duress, the subjective perceptions of the victims of the duress, the pressures of time and the overall circumstances of this case, the element of potential injury to the business and livelihood of the owners of Portrait Homes, and to the reputation of that business. These are all legitimate factors to be weighed in applying the concept of economic duress. Id., §§ 71:14 ("No alternative under circumstances"); 71:18 ("Protest as evidence of duress or coercion"); 71:40 ("Injury to business or livelihood").

[¶ 27] As noted above, the district court is not required to set out in detail in its findings all of the evidentiary and ultimate facts that may be gleaned from the documentary evidence and transcripts (although, of course,

the more complete the details, the better). In my estimation, the district court adequately set out both the evidentiary facts that it looked to in reaching a conclusion as to ultimate facts, and it applied those facts correctly to the applicable law. Paul Vinluan had a contract with Portrait Homes to provide drywall materials and to install them in a residence owned by Portrait Homes. Aspen Construction had no contractual relationship, nor any other relationship, with Portrait Homes. As a stranger to Portrait Homes, and as a volunteer, Aspen Construction paid for the materials that were eventually incorporated into the home owned and built by Portrait Homes.[3] Aspen Construction did so, in part as a guarantor of Paul Vinluan's credit,[4] in part to gain an advantage over its competitors in the home construction business (Aspen Construction got "first call" on Vinluan's time for its construction projects as part of its agreement with Vinluan to guarantee his creditworthiness), and in part because it furthered personal relationships between Keith Dobson, the owner of Aspen Construction, and his associates.

[¶ 28] It is unmistakable from this testimony that neither Aspen Construction nor Dobson was a "materialman" as contemplated by the governing Wyoming statutes, indeed, Aspen Construction's argument in this case would expand the category of persons who qualify as materialmen to an absurd sort of infinity (i.e., to any person who might have provided credit of any sort to a materialman). See Wyo. Stat. Ann. § 29–1–201(a)(vi) (Lexis-Nexis 2003). Nonetheless, Aspen Construction intentionally and maliciously threatened to file a materialman's lien against the residence owned by Portrait Homes, in order to collect money owed to it by Vinluan (whether

---

**3.** A local building supplies company actually sold the materials that form the basis of Aspen Construction's claims in this case to Vinluan. As contemplated by the statute, that company was the materialman in this case. A representative of that company provided uncontradicted testimony that the materials used in the construction of the home were paid for and it had no basis for a materialman's lien against Portrait Homes. He also made clear that all materials that leave that business are paid for before they leave the premises ("That's how we're able to stay in business.").

**4.** In this regard, *see* 53 Am.Jur.2d *Mechanics' Liens* § 97 at 160–61 (1996) ("Statutes that permit a lien for materials furnished usually apply only to a furnishing for building purposes, and do not include a furnishing for general or unknown purposes, or an ordinary sale in the usual course of trade or on a general open account, or a sale without any reference as to what will be done with the material sold.").

the money was technically owed to Dobson or to Aspen Construction is not entirely clear, but the facts extant suggest that Vinluan owed the money at issue in this case to Aspen Construction. However, failing that, Dobson owed it to Aspen Construction, unless, of course, Dobson and Aspen Construction are, in fact, one and the same person).[5]

[¶ 29] The majority opinion describes what ensued as a stalemate, but I am convinced that the facts support a much darker conclusion, i.e., that Dobson used a spurious claim to a materialman's lien in order to extort money from Portrait Homes that was, in reality, owed to Dobson solely by Vinluan. Indeed, the record is clear that Dobson did so without making any credible effort to collect the money from Vinluan. In addition, Dobson did not threaten the filing of the lien until the last possible date for its filing, and after knowing for over three months that Vinluan had not paid him according to the terms of the oral agreement between them. Dobson was able to employ this ruse to great effect, because he knew he had Portrait Homes over the proverbial barrel. Portrait Homes had completed construction of the residence and was about to sell it (Portrait Homes had to make a decision about how to avoid/mitigate its potential losses from this situation over a period of time that was quite brief, given the complexity of the dilemma Dobson presented for Portrait Homes). A lien against the property could have had the effect of frustrating the sale of the $390,000.00 property, even though Dobson needed to be paid only the paltry sum of $3,645.18 [Vol. III, 78–80]. The record is also clear that Portrait Homes could readily pay that amount, if Dobson could prove, in an appropriate forum, that he was entitled to such payment from Portrait Homes. The trouble with that scenario is that Dobson clearly could not collect from Portrait Homes because he could not prove such a debt. However, by filing the lien, and actually by merely threatening to file such a lien, and creating the necessarily resulting legal entanglements that accompany the filing of such a lien, Dobson could coerce Portrait

Homes to pay him, even though it owed him nothing. In addition, the majority elevates form over substance by concluding that Portrait Homes had reasonable alternatives other than paying Dobson in order to avert the filing of a lien. The record reveals that Portrait Homes stood to lose the sale of a $390,000.00 home, possibly its good credit, and likely its reputation as a sound business operation, if it had not done so within the very limited time strictures imposed by Dobson's late filed lien.

[¶ 30] For these reasons, I would affirm the judgment of the district court in all respects.

---

5. At trial, Dobson needed to be reminded of the distinction between his corporation (Aspen) and